UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - x
                                    :
UNITED STATES OF AMERICA,           :
                                    :
            - v. -                  :
                                    :
SHAWN D. TAYLOR and                 :
KITSON J. SMITH                     :        09 Cr. 273 (KMK)
                                    :
            Defendants.             :
                                    :
- - - - - - - - - - - - - - x


MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA
IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS


                              LEV L. DASSIN
                              Acting United States Attorney
                              for the Southern District of
                              New York
                              One St. Andrew's Plaza
                              New York, New York 10007


Benjamin Allee
Assistant United States Attorney
      -Of Counsel-

## TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . 1

BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.   Offense Conduct . . . . . . . . . . . . . . . . . . 2

    II.  Post-Indictment Discovery. . . . . . . . . . . . . .7

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.   Taylor's Motion to Suppress Should Be Denied. . . . 8

        A.   There Was Probable Cause Supporting the Search
            Warrants . . . . . . . . . . . . . . . . . . . .9

            1.   The October 27 Search Warrant for the First
                 Crate. . . . . . . . . . . . . . . . . . . . 13

            2.   The October 29 Search Warrant for the Second
                 Crate. . . . . . . . . . . . . . . . . . . . 18

        B.   Officers Relied on the Search Warrants in Good
            Faith. . . . . . . . . . . . . . . . . . . . . .19

    II.  Smith's Motion to Suppress His Post-Arrest Statements
       Requires an Evidentiary Hearing. . . . . . . . . . .22

    III. Smith's Remaining Motions Should Be Denied. . . . . .23

        A.   Pre-Trial Hearing as to the Existence of a
            Conspiracy. . . . . . . . . . . . . . . . . . . 23

        B.   Information About Confidential Informants. . . .26

        C.   Bill of Particulars . . . . . . . . . . . . . .26

        D.   Rule 404(b) Material . . . . . . . . . . . . . .31

        E.   Prior Convictions, Bad Acts, Uncharged Crimes
            Offered for Impeachment Purposes. . . . . . . . 33

        F.   Brady Material . . . . . . . . . . . . . . . . .34

        G.   Permission to Join in Taylor's Pre-Trial
            Motion. . . . . . . . . . . . . . . . . . . . .37

IV.  The Government Seeks to Offer at the Evidentiary
    Hearing Statements Made by Smith During Proffer
    Sessions. . . . . . . . . . . . . . . . . . . . . . . . . . .39

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the pretrial motions of defendants Shawn D. Taylor and Kitson J. Smith.

In Taylor's pre-trial motion, Taylor seeks suppression of approximately 220 kilograms of marijuana found upon searches of two packages he sent.  In Smith's pre-trial motion, Smith seeks an order: (1) granting a pre-trial evidentiary hearing as to the existence of a conspiracy; (2) compelling the Government to disclose information about confidential informants; (3) directing the Government to provide a bill of particulars; (4) suppressing Smith's post-arrest statements, or, alternatively, granting a hearing regarding whether the statements were made voluntarily; (5) compelling the Government to disclose evidence of Smith's other crimes, wrongs, or acts the Government intends to offer in evidence at trial pursuant to Rule 404(b) of the Federal Rules of Evidence; (6) precluding the Government from using evidence of Smith's prior convictions, bad acts or uncharged crimes in the Government's case-in-chief, or as impeachment material; (7) compelling the Government to disclose exculpatory evidence pursuant to Brady v. Maryland, 373 U.S. 83 (1963); and (8) permitting Smith to join in pre-trial motions of Taylor.

Defendant Taylor's motion is without merit, and should

1

be denied.  Defendant Smith's motion is without merit and should
be denied, except that in light of Smith's sworn declaration
submitted with his motion in which Smith states that he was not
given Miranda warnings, the Government consents to an evidentiary
hearing regarding Smith's motion to suppress his post-arrest
statements on the ground of involuntariness.

BACKGROUND

I.   Offense Conduct

        Defendants Shawn D. Taylor and Kitson J. Smith are
charged in a one-count Indictment with conspiring to distribute
100 kilograms and more of marijuana from on or about October 27,
2008 through on or about November 3, 2008, in violation of Title
21, United States Code, Sections 812, 841(a)(1), 841(b)(1)(B),
and 846.

        As defendant Taylor admits in his "Declaration of
Ownership" submitted with his motion, Taylor was the owner and
shipper of two crates containing approximately 95 kilograms and
125 kilograms of marijuana, respectively, shipped from Arizona to
New York in October 2008.  (Taylor Br., Ex. D; see id. at 4, ¶
11; Compl., ¶¶ 2, 12.)[1]  Taylor shipped the first marijuana crate

---

[1]      "Taylor Br." refers to defendant Taylor's Motion to
Suppress Evidence and the attachments thereto, and "Smith Br."
refers to defendant Smith's Motion.

        The following documents are attached to this Memorandum
as follows: (1) the Complaint (Exhibit A); (2) the transcript of
the October 27, 2008 oral search warrant (the "October 27 Search

on or about October 27, 2008 (the "First Crate"), and the second
marijuana crate on or about October 29, 2008 (the "Second
Crate"). (Taylor Br., Ex. D; see Compl., ¶¶ 2, 12.)   Taylor
shipped both crates from a UPS store in Tucson, Arizona (the "UPS
Store"), using the fictitious name "Junior Jones," to the address
"Barry House Coffee" at 110 Hartford Avenue, Mt. Vernon, New
York. (Taylor Br., Ex. D; see id. at 4, ¶¶ 11, 14, 15.)

        Both crates were searched pursuant to search warrants
issued by Pima County Superior Court Judge Michael Miller upon
the affidavits of Officer Ferdinand Tolentino of the Oro Valley,
Arizona, Police Department (the "October 27 Search Warrant" and
the "October 29 Search Warrant").[2]  In each affidavit, Officer
Tolentino described that he was assigned to a "DEA Transportation
Group" and that his training included the identification of
marijuana, narcotic drugs and dangerous drugs, that he was
investigating marijuana crimes, and that he had probable cause to
believe that the crate that was the subject of each search
warrant contained marijuana, drug money, and drug paraphernalia.
(October 27 Search Warrant, at 1-2; October 29 Search Warrant, at

_____

Warrant") (Exhibit B); (3) the transcript of the October 29, 2008
oral search warrant (the "October 29 Search Warrant") (Exhibit
C); (4) a disc containing the audio of the October 27 Search
Warrant and October 29 Search Warrant (Exhibit D); and (5) the
Proffer Agreement (Exhibit E), discussed infra, Part IV.

    [2]    Each search warrant was issued telephonically upon oral
affidavits of Officer Tolentino.  (October 27 Search Warrant;
October 29 Search Warrant.)

1-2.)

In the affidavit in support of the October 27 Search Warrant for the First Crate, Officer Tolentino described the following circumstances regarding the shipment of the crate: (1) he had received information from a source of information who stated that a subject brought three boxes to the UPS Store to be placed into a crate and shipped; (2) according to the source of information, the subject "initially stated that the contents of the packages were books then changed it to computer equipment"; (3) the weight of the crate and its contents was estimated at 215 pounds; (4) "the shipper paid the $2,860.00 shipping cost in cash made up of twenty dollar bills"; (4) the destination address for the crate – "Barry House Coffee" at 110 Hartford Avenue, Mt. Vernon, NY – could not be located, but rather a "Barrie House Coffee" at a different address in Mt. Vernon was located; (5) the shipper gave the name Junior Jones and an address, but the address was an apartment complex and the shipper did not give an apartment number; and (6) the phone number given by the shipper was a Phoenix phone number.  (October 27 Search Warrant, at 2-3.)

In addition, in the October 27 Search Warrant for the First Crate Officer Tolentino described a dog sniff done on the loading dock of ABF Freight, where the crate had been brought, as follows:

> At approx 6:30 PM, Officer Roger Reynolds, a K-9 handler for the Oro Valley Police Department, responded

4

> to ABF Freight to assist with the investigation.
> Officer Reynolds had his K-9 Nikko check the crate
> along with other items on the ABF loading dock.    At
> 1841 hrs Officer Reynolds stated that his K-9 Nikko
> alerted on the crate to NY and no other packages on the
> dock.

(October 27 Search Warrant, at 3.)   Upon these facts and

circumstances set forth by Officer Tolentino, Judge Miller issued

a search warrant for the First Crate, and approximately 95

kilograms of marijuana were found and seized.

In the affidavit in support of the October 29 Search

Warrant for the Second Crate, Officer Tolentino described the

following circumstances regarding the shipment of the crate: (1)

the First Crate was found to contain approximately 200 pounds of

marijuana; (2) according to a source of information, the same

subject who shipped the First Crate had again brought three boxes

to the UPS Store to be placed into a crate and shipped to the

same address in New York through Roadway Express; (3) the subject

paid for the Second Crate in cash; and (4) the Second Crate was

addressed to "Barry House Coffee" at 110 Hartford Avenue, Mt.

Vernon, NY.   (October 29 Search Warrant, at 2.)

In addition, in the October 29 Search Warrant for the

Second Crate, Officer Tolentino again described a dog sniff, in

this instance done in a Roadway Express truck, where the crate

had been brought, as follows:

> At approx 1730 Hrs. Officer Roger Reynolds, a K-9
> handler for the Oro Valley Police Department, responded
> to Roadway Express to assist with the investigation.

5

Officer Reyonlds had his K-9 Nikko check the crate along with other items in the Roadway truck.  At 1745 hrs Officer Reynolds stated that his K-9 Nikko alerted on the crate to NY.

(October 27 Search Warrant, at 3.)  Upon these facts and circumstances set forth by Officer Tolentino, Judge Miller issued a search warrant for the Second Crate, and approximately 125 kilograms of marijuana was found and seized.

According to the Complaint, law enforcement officers replaced the marijuana in the First Crate with objects of roughly equivalent weight and returned the crate for a controlled delivery.  (Compl., ¶ 3.)  When the First Crate arrived at the Warehouse in Mt. Vernon, on or about November 3, 2008, defendant Smith was waiting for it.  (Compl., ¶¶ 5-6.)  Smith had formerly worked at the Warehouse but no longer worked there as of November 3, 2008, and was not authorized to be there.  (Compl., ¶ 9.)  Smith picked up the crate on a forklift and drove it inside the Warehouse.  (Compl., ¶ 6.)  Approximately 15 to 20 minutes later, Taylor arrived at the Warehouse riding in the passenger seat of a black Lexus SUV.  (Compl., ¶ 7-8.)  Smith approached the driver's side of the Lexus and was handed a box containing a power drill.  (Compl., ¶ 7-8.)  Smith then retrieved a hammer from his car.  (Compl., ¶ 8.)  Shortly thereafter, Smith and Taylor were each arrested.  (Compl., ¶ 8.)

Smith made an oral statement following his arrest. Smith initially stated, in part and in substance, the following:

6

(1) he arrived at the Warehouse the morning he was arrested to work, and was to work until the afternoon; (2) while working he was visited by his cousin who wanted Smith to copy cds for him; and (3) Smith's cousin gave Smith a drill and then left, saying he would be right back.  After being confronted with inconsistencies in his story, Smith then stated, in part and in substance, the following: (4) a week or two before he was arrested, Smith was asked by an individual he knew only as "Smoke" if Smith could have a compressor shipped to the Warehouse; (5) once the compressor arrived Smoke would call Smith and make arrangements to have it picked up; and (6) Smith did not have a phone number for Smoke and this was the first time Smith had done this for Smoke.

## II.   Post-Indictment Discovery

On or about April 1, 2009, the Government produced discovery to each of the defendants.  Defendant Smith received a copy of each the following: the Indictment; the Complaint; Smith's criminal history records; a photo lineup including a photo of defendant Taylor from which he was identified; papers found on Taylor when he was arrested; reports describing property seized from the defendants; lab reports for the marijuana seized from the crates; a fingerprint examination report; an ABF Freight invoice; a report containing a description of Smith's post-arrest statement; a report containing a description of a statement made

about the contact information of the shipper of the crate; toll records for cell phones found at the time of the arrests in this case; the October 27 Search Warrant and the October 29 Search Warrant and supporting affidavits; photographs of the crates and the individuals who shipped the Second Crate; a video surveillance recording from the time period when the First Crate was shipped.  On or about May 15, 2009, Smith received from the Government an additional fingerprint report.[3]

ARGUMENT

I.   Taylor's Motion to Suppress Should Be Denied

Taylor moves to suppress the marijuana found in each of the crates he shipped, arguing that there was not probable cause for the search warrants because information about the reliability of the dog that alerted to the crates was omitted.  Taylor is wrong, for several reasons.  First, there was probable cause to search the First Crate, based on the suspicious circumstances of the shipment of the crate, combined with the evidence of the dog alert to the crate, which any reasonable person would understand was a narcotics alert by a trained police dog.  Second, there was probable cause to search the Second Crate, because the facts supporting probable cause for that search included the discovery of the more than 200 pounds of marijuana in the First Crate.  And

---

[3]      The Government produced similar discovery to defendant Taylor, which is not pertinent to the defendants' motions.

third, even were there not probable cause to search the crates, which there was, the officers relying on the search warrants for the crates did so in good faith.  Taylor's motion should therefore be denied.

A.   There Was Probable Cause Supporting the Search Warrants

The task of a judge in issuing a warrant is to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  Illinois v. Gates, 462 U.S. 213, 238 (1983).  Such a determination must be approached in a practical way, id. at 232, because "probable cause is a flexible, common-sense standard," Texas v. Brown, 460 U.S. 730, 742 (1983).  The evidence presented to the judge, therefore, "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."  Gates, 462 U.S. at 231-32 (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).  The judge deciding whether to issue a warrant should take into account the "totality-of-the-circumstances" and his consideration should include an "assessment of probabilities in particular factual contexts."  Id. at 232-33.  Probable cause for a search warrant exists if "given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a

crime will be found in a particular place." Gates, 462 U.S. at
238; see also United States v. Travisano, 724 F.2d 341, 346 (2d
Cir. 1983) (stating that the evidence supporting probable cause
need not be overwhelming: "it is only a probability, and not a
prima facie showing of criminal activity, that is the standard
for probable cause."); United States v. Falso, 544 F.3d 110, 117
(2d Cir. 2008) (same).

        A judge's determination that probable cause existed to
support the issuance of a search warrant "should be paid great
deference by reviewing courts." Gates, 462 U.S. at 236. A
search warrant issued by a magistrate judge "will be upheld on
less persuasive evidence than would have justified a police
officer acting on his own," and that determination "is itself a
substantial factor tending to uphold the validity of the
warrant." United States v. Travisano, 724 F.2d at 345. Where an
issuing judge has determined that the probable cause standard was
met and has duly issued a warrant, the role of a reviewing court
is circumscribed to ensuring that the issuing magistrate judge
had a "substantial basis" for concluding that probable cause
existed. Gates, 462 U.S. at 236; see also Walczyk v. Rio, 496
F.3d 139, 157 (2d Cir. 2007). Any doubt should be resolved in
favor of upholding the warrant. See United States v. Ventresca,
380 U.S. 102, 108 (1965); United States v. Ornelas, 517 U.S. 690,
699 (1996).

The totality-of-the-circumstances analysis is
applicable, as in all cases, where the facts supporting the
probable cause determination include a dog alert to the premises
to be searched.  See United States v. Young, 745 F.2d 733, 756-58
(2d Cir. 1984); United States v. Waltzer, 682 F.2d 370, 372-73
(2d Cir. 1982); United States v. Johnson, 660 F.2d 21, 22-23 (2d
Cir. 1981).  In analyzing probable cause determinations made in
part upon dog alerts, courts within and without the Second
Circuit often note descriptions of the dog's reliability and/or
training set forth in search warrant affidavits.  See, e.g.,
United States v. Dillon, 810 F. Supp. 57, 62 (W.D.N.Y. 1992)
(finding for the Government where affidavit stated dogs were
trained to detect narcotics); United States v. Cortez, No. 95 Cr.
275 (RPP), 1995 WL 422029, at *3 (S.D.N.Y. July 18, 1995)
(finding for the Government where affidavit stated dog
responsible for numerous previous seizures and had alerted on 22
occasions); United States v. Daniel, 982 F.2d 146, 151 (5th Cir.
1993) (finding for the Government where affidavit stated dog was
trained to detect narcotics).

There is no requirement, however, that any statement of
a dog's past reliability or training is necessary for a search
warrant to issue where a dog has alerted to the premises.  See,
e.g., United States v. Glover, 957 F.2d 1004, 1013 (2d Cir. 1992)
("[O]nce the narcotics dog 'hit on' Glover's bags, the police had

11

probable cause to obtain a search warrant."); United States v. Martinez, 869 F. Supp. 202, 208 (S.D.N.Y. 1994) ("O'Neill's affidavit included, among other things, the information that a dog handled by the Customs Service had responded positively to the packages. In the Second Circuit, such information is sufficient by itself to establish probable cause."); Dillon, 810 F. Supp. at 61 ("[T]he canine sniffing technique is now sufficiently well-established to make a formal recitation of a police dog's curriculum vitae unnecessary in the context of ordinary warrant applications." (internal quotation marks omitted)).  Where a description of the circumstances of a dog alert is sparse or omits obvious facts, courts have nevertheless found the descriptions sufficient and have presumed that the judge issuing the search warrant reasonably inferred those obvious facts.  See United States v. Negron, No. 04 Cr. 929 (LMM), 2005 WL 701237, at *1-2 (S.D.N.Y. Mar. 25, 2005) (finding that issuing judge "could have reasonably inferred" that the dog handler was present when the dog alerted); Dillon, 810 F. Supp. at 59-61 (finding that the issuing judge "could reasonably have inferred" that the dogs were sufficiently certified where the dogs were merely described as trained to detect particular narcotics); see also Gates, 462 U.S. at 236 ("[C]ourts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner." (internal

quotation marks and alterations omitted)).

Here, Taylor ignores all but one fact supporting probable cause — the dog alerts — arguing that the search warrants were based solely on the alerts and that "[t]here was no other evidence indicative of criminal activity." (Taylor Br., at 5, ¶ 17.) A number of facts, however — including, but not limited to the dog alerts — were set forth in each affidavit showing a fair probability that narcotics would be found in each of the crates. See Gates, 462 U.S. at 238. In addition, while the description of the dog alerts was minimal, it was sufficient when combined with the other circumstances to support the probable cause determination.

1.   The October 27 Search Warrant for the First Crate

With respect to the First Crate, Officer Tolentino — an experienced police officer with specialized training in the investigation of narcotics distribution and transportation — described several suspicious aspects of the crate's shipment and the shipper, who turned out to be Taylor. Virtually all of the information Taylor gave about the package was suspicious. Taylor's description of the contents of the crate was unreliable: he claimed first it was computer equipment and then claimed it was books. The destination address for the package was unreliable: the company to which the package was addressed was misspelled, and the street address for the company was completely

13

different from the listed address for the company.  The shipper
information Taylor gave was also unreliable: using the fictitious
name Junior Jones, Taylor gave an address in Tucson that turned
out to be an apartment complex, but gave no apartment number, and
gave a phone number not for Tucson but for Phoenix.  And, this
misinformation was not for any small package, but rather for
crate in excess of 200 pounds that cost $2,860, for which Taylor
paid in cash, entirely in $20 bills.  Then, K-9 Nikko, with his
K-9 Handler from the police department, alerted to this crate and
to no other packages on the shipping company loading dock.

        Under these circumstances, clearly there was a
substantial basis for Judge Miller's common sense determination
that probable cause existed to search the First Crate.  The
affidavit described a crate where information about its contents,
shipper, and destination was apparently bogus, which tended to
show that the shipment contained contraband; the shipper paid
thousands of dollars in cash for the shipment, in $20 bills,
which, while innocent on its own, combined with the other
circumstances further tended to show the shipment contained
contraband; and a K-9 unit dog was called in to assist with a
drug enforcement officer and alerted to the package, which
further tended to show the package contained contraband, in
particular, narcotics.  These circumstances, when viewed
together, were indicative of a shipment of narcotics, and Judge

Miller's determination that they amounted to probable cause
should be paid deference and upheld.  Cf. Martinez, 869 F. Supp.
at 204, 208 (upholding probable cause finding where affidavit
described, among other things, that the package had a fictitious
return address and a destination address with misinformation, and
a dog alert by a dog handled by the Customs Service).

     Taylor's only challenge to the October 27 Search
Warrant is that the affidavit did not specify the dog's training
or reliability.  Taylor's position is that had the affidavit
stated that the dog was "trained and certified," there would have
been probable cause to issue the October 27 Search Warrant for
the First Crate, but the omission of these words or a fuller
recitation of the dog's past reliability and training undermines
the probable cause determination.  (Taylor Br., at 11, ¶ 36.)
This argument is without merit.

     Whereas Taylor relies on a hypertechnical
interpretation of the affidavit, a common sense reading of the
affidavit shows that Judge Miller reasonably inferred that Nikko
was a police K-9 unit narcotics dog alerting to narcotics in the
First Crate.  The affiant who was investigating the case, Officer
Tolentino, described at relative length his training in narcotics
detection and investigation, that he was assigned to a DEA
Transportation Group, and that on the basis of the investigation
he believed narcotics were concealed in the First Crate.  The

15

affidavit described that the dog sniff was undertaken during the course of Officer Tolentino's investigation.  The affidavit further described that the dog sniff was done by a K-9 accompanied by a "K-9 handler" police officer.  This description was minimal, but nevertheless hardly permitted any conclusion other than that Nikko is a police dog trained to sniff and alert to narcotics.  Certainly Judge Miller reasonably inferred as much when he granted the search warrant.

       As for reliability, while Nikko's track record was not described in the affidavit, no such description was required. See Dillon, 810 F. Supp. at 61.  Moreover, the affidavit noted that Nikko alerted only to the First Crate, and not to any of the other packages on the loading dock.  Nikko's alert to the package, much like a witness's identification of a suspect from a photo array, was reliable to a certain extent on its face because it was corroborated by the other circumstances giving rise to probable cause.  In this way the case differs from United States v. Sundby, 186 F.3d 873 (8th Cir. 1999), and United States v. McCaney, 177 Fed. Appx. 704 (9th Cir. 1999), on which Taylor relies, in which the dog sniff of the package alone was offered to show probable cause.[4]

_____

[4]    See also United States v. Klein, 626 F.2d 22, 27 (7th Cir. 1980) (cited in Taylor Br., at 11, ¶ 34) ("This is not a case in which we need confront the thorny problem of an indiscriminate, dragnet-type sniffing expedition. Rather, this is a case in which authorities already had a reasonable suspicion to believe that the luggage contained contraband and used a dog as a

16

The cases Taylor cites do not support his argument that the probable cause determination turns on whether the affidavit expressly includes the words "trained and certified."  (Taylor Br., at 7-11, ¶ 23-35.)  The Second Circuit has not held that any particular description of the dog is required, nor has the defendant cited (nor the Government found) a case where a court within the Second Circuit suppressed evidence on the ground that the background provided on a dog was insufficient.  Taylor therefore cites to cases outside the Second Circuit, but none of these cases support Taylor's argument for a hypertechnical reading of the affidavit that turns on whether the words "trained and certified" are expressed or implied.  Taylor relies, for example, on <u>United States v. $67,220.00 in United States Currency</u>, 957 F.2d 280, 285-86 (6th Cir. 1992), but there the Court agreed that there was probable cause based on the totality of the circumstances even though there was "no indication in the record as to the [dog's] trustworthiness."  <u>See also</u> <u>United States v. Meyer</u>, 536 F.2d 963, 966 (1st Cir. 1976) (emphasizing that "a magistrate's determination of probable cause is based upon a common sense and realistic reading of the entire affidavit," ruling that the magistrate could have reasonably inferred that a dog described as "trained" had the ability to

---

further investigatory device. When the dog alerted the authorities to defendants' luggage, probable cause for issuance of a warrant was then established.")

17

"sniff out cocaine"); <u>United States v. Venema</u>, 563 F.2d 1003, 1007 (10th Cir. 1977) (agreeing with the <u>Meyer</u> Court).[5]

The October 27 Search Warrant, therefore, was issued upon a proper finding of probable cause, and Taylor's motion to suppress the marijuana found in the First Crate should be denied.

2.    The October 29 Search Warrant for the Second Crate

With respect to the Second Crate, the facts supporting probable cause were even stronger than for the First Crate.  The affidavit states that the same shipper who two days before sent the First Crate brought more packages to the same UPS Store to be placed into the same kind of crate and shipped to the same misspelled and misaddressed destination, and again paid in cash. Again the same K-9 alerted to the crate.  In this instance, however, in addition to these circumstances, the affidavit describes that the First Crate contained approximately 200 pounds of marijuana.

---

[5]    The other cases Taylor cites from circuit and district courts outside the Second Circuit also do not support Taylor's assertion that a search warrant affidavit must recite that a dog is "trained and certified," but rather simply hold that a dog sniff alone may support the issuance of a search warrant, and address instances where the only fact supporting probable cause was the sniff of an unreliable dog.  <u>See Karnes v. Skrutski</u>, 62 F.3d 485, 498 (3d Cir. 1995); <u>United States v. Burton</u>, 193 F.R.D. 232, 242 (E.D. Pa. 2000); <u>United States v. Florez</u>, 871 F. Supp. 1411 (D.N.M. 1994); <u>United States v. Sanchez</u>, No. 98 Cr. 4033, 1999 WL 33657684 (N.D. Iowa 1999).  <u>See also United States v. Kennedy</u>, 131 F.3d 1371, 1376 (10th Cir. 1997) (upholding probable cause determination based nearly entirely on a dog sniff even where affidavit omitted previous failures by the dog known to the affiant).

These facts and circumstances clearly demonstrated probable cause to search the Second Crate, particularly because the marijuana found in the First Crate was described in the affidavit for the Second Crate. Therefore, provided that the search of the First Crate was lawful — either or both because the October 27 Search Warrant was issued upon a proper finding of probable cause as set forth above, and/or because Officer Tolentino acted on the October 27 Search Warrant for the First Crate in good faith as set forth below — the search of the Second Crate was lawful as well.

B.   Officers Relied On the Search Warrants in Good Faith

Even if the Court were to find that the October 27 Search Warrant and/or the October 29 Search Warrant was not supported by probable cause, which it should not, the evidence recovered pursuant to the warrants still should not be suppressed because law enforcement officers relied on the search warrants in good faith.  It is well-settled that, with certain limited exceptions not applicable here, where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant," the Fourth Amendment exclusionary rule does not apply.  United States v. Leon, 468 U.S. 897, 922 (1984). The Supreme Court has held that the "marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated

19

search warrant cannot justify the substantial costs of exclusion." Leon, 468 U.S. at 922; see also Herring v. United States, 129 S.Ct. 695, 703 (Jan. 14, 2009).

"The essential rationale underlying [this] good faith exception is that the exclusionary rule 'cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.'" United States v. Cancelmo, 64 F.3d 804, 807 (2d Cir. 1995) (quoting Leon, 468 U.S. at 919); see also Arizona v. Evans, 514 U.S. 1, 10 (1995) (use of exclusionary rule is not warranted where it does not result in deterrence). The pivotal question in a particular case is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Leon, 468 U.S. at 922 n.23; see also United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992). If the reviewing court finds that the officers' reliance on the warrant was objectively reasonable, suppression is not warranted. See, e.g., United States v. Roberts, 852 F.2d 671, 675 (2d Cir. 1988).

The only instances where the good faith exception does not apply are where: (1) the issuing judge was deliberately or recklessly misled by information the affiant knew was false; (2) the issuing judge wholly abandoned his or her judicial role; (3) the supporting affidavit lacked any indicia of probable cause; or (4) the warrant was "so facially deficient ~ i.e., in failing to

particularize the place to be searched or the things to be seized
- that the executing officers cannot possibly presume it to be
valid." See Leon, 468 U.S. at 923.   Taylor has not established
any of the four situations which would preclude the application
of the good faith exception in this case.

        For the same reasons Taylor argued that the search
warrants were invalid, he also contends that the affidavits
supporting the search warrants were so lacking in any indicia of
probable cause, and so facially deficient, that reliance on them
could not have been in good faith (exceptions 3 and 4).   (Taylor
Br., at 11-12.)   Taylor's argument with respect to good faith
fails for the same reasons it failed with respect to probable
cause.   Officer Tolentino's reliance on both search warrants was
objectively reasonable.   A reasonably well-trained officer
performing the search would have no reason to believe it was
illegal, which it was not, despite Judge Miller's authorization.
Rather, the officer would believe, as Officer Tolentino rightly
believed, that Judge Miller lawfully concluded upon the facts and
circumstances described above that probable cause existed to
search each crate.   The October 27 Search Warrant and the October
29 Search Warrant clearly were neither lacking any indicia of
probable cause nor facially deficient.   See United States v.
Moore, 968 F.2d 216, 222 (2d Cir. 1992) (upholding application of
good faith exception because "the warrant application presented

21

to [the judge] was not a bare bones affidavit, but rather
contained many objective facts"); Cortez, 1995 WL 422029, at *3
("Furthermore, even if the warrant was unsupported by probable
cause, clear legal authority requiring that a record of [the
dog]'s prior hits and misses be included in the Search Warrant
Application is lacking, and thus such a warrant could be relied
upon in objective good faith since a reasonably well trained
officer would not have known that the search was illegal despite
the magistrate's authorization." (internal quotation marks and
alterations omitted)).

Law enforcement officers' reliance on the judicial
determination made by Judge Miller in authorizing the searches
was reasonable, and the searches conducted under the authority of
the warrants were reasonable.   The marijuana seized should not be
suppressed.

II.   Smith's Motion to Suppress His Post-Arrest Statements
      Requires an Evidentiary Hearing

Smith moves to suppress the statements he made to law
enforcement officers following his arrest, or in the alternative
for an evidentiary hearing, alleging that these statements were
involuntary because, according to Smith, he was not given proper
Miranda warnings prior to making the statements.   See Miranda v.
Arizona, 384 U.S. 436 (1966).   In light of Smith's sworn
declaration, submitted with his motion, in which he claims that
he was not informed that he had the right to an attorney, the

22

Government consents to the holding of an evidentiary hearing.
The Government anticipates that the evidence at the hearing will
show that Smith was advised of his rights pursuant to Miranda
warnings and waived those rights.

III. Smith's Remaining Motions Should Be Denied

Defendant Smith has made a boilerplate motion setting
forth a litany of extraordinary requests.  Because these requests
are either moot, premature, and/or not required by any statute or
the Federal Rules of Criminal Procedure, the Government
respectfully submits that each of Smith's requests be denied.

A.    Pretrial Hearing as to the Existence of a Conspiracy

Smith requests "a pretrial hearing to determine whether
independent evidence exists as to the conspiracy or conspiracies
charged in the indictment and Smith's involvement therein."[6]
(Smith Br., Part I (citing United States v. James, 590 F.2d 575
(5th Cir. 1979)).)  Because such hearings are not required and
the Second Circuit has prescribed a different procedure for
determining the existence of a conspiracy for purposes of
admission of co-conspirator statements, this request should be

_____

[6]    Smith's request, "in the alternative," "that the Court
inspect the Grand Jury minutes in camera to determine whether the
government has met its burden as to the required showing of the
existence of a conspiracy," should be denied.    There is
absolutely no basis for this extraordinary request to violate the
secrecy of the grand jury proceedings.  See In re Grand Jury
Proceedings, 103 F.3d 234, 239 (2d Cir. 1998); United States v.
Wilson, 565 F. Supp. 1416, 1436-37 (S.D.N.Y. 1983).

denied.

While at least one circuit once required holding a
pretrial hearing to determine whether a conspiracy existed in
cases where co-conspirator admissions would be offered at trial
pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence,
see James, 590 F.2d 575, the Second Circuit has rejected use of
such hearings.  See United States v. Geaney, 417 F.2d 1116, 1120
(2d Cir. 1969); United States v. Walker, 922 F. Supp. 732, 746
(N.D.N.Y. 1996); United States v. Feola, 651 F. Supp. 1068, 1129-
30 (S.D.N.Y. 1987) ("In this Circuit, the functional equivalent
of what the Fifth Circuit calls a James hearing and requires
before trial is provided by a Geaney ruling, which is provided
only during trial, and relies for its basis on the facts adduced
at trial, including evidence received subject to a motion to
strike at the close of the Government's case. . . . Defendants
who want James hearings should so conduct their business as to be
tried in the Fifth or Eleventh Circuits.").

Rather, in the Second Circuit the procedure for
admitting co-conspirator hearsay statements made in furtherance
of the conspiracy is to permit introduction of the statements at
trial subject to connection.  "Under the Geaney rule, statements
proffered as coconspirator statements may be admitted in evidence
on a conditional basis, subject to the later submission of the
necessary evidence" to establish the prerequisites for admission.

24

United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993); see
Bourjaily v. United States, 483 U.S. 171 (1987); United States v.
Saneaux, 365 F. Supp. 2d 488 (S.D.N.Y. 2005) (discussing the
Geaney procedures in light of amendments to Rule 801(d)(2)(E));
United States v. Saneaux, 365 F. Supp. 2d 493, 503 (S.D.N.Y.
2005) ("[A]dher[ing] to the near uniform practice of district
judges in this circuit and refrain[ing] from requiring the
government to offer this proof in a pre-trial evidentiary
hearing. . . ."). Following admission of the co-conspirator
hearsay statements at trial, "[i]f the government succeeds in
persuading the court that the conditionally admitted
coconspirator statements were made during and in furtherance of a
conspiracy of which both the declarant and the defendant were
members, the statements are allowed to go to the jury. If the
court is not so persuaded, it either should instruct the jury to
disregard the statements, or; if those statements were so large a
proportion of the proof as to render a cautionary instruction of
doubtful utility, should declare a mistrial." Tracy, 12 F.3d at
1199.

        Here, the Court should deny Smith's request, and
instead at trial should conditionally admit statements of Smith's
co-conspirators made in furtherance of the conspiracy, subject to
later submission of the necessary evidence to establish the
existence of a conspiracy.

B.    Information About Confidential Informants

        Smith seeks an order "compelling the Government to
disclose the identity, Social Security number, dates of birth,
address, and criminal history of any confidential informants used
by the Government in this case," or "in the alternative [to] make
these people available for counsel to interview." (Smith Br.,
Part II.)  This request should be denied.  Smith has no right to
such disclosure absent an unusual showing of need, which he has
fallen far short of making.  See United States v. Saa, 859 F.2d
1067, 1073 (2d Cir. 1988); United States v. Muyet, 945 F. Supp.
586, 602 (S.D.N.Y. 1996).  In any case, at present there are no
confidential informants used by the Government in this case.
Smith's motion is moot and should be denied.

C.    Bill of Particulars

        Smith claims that "[t]he government has revealed
nothing in discovery which indicates that each defendant
knowingly joined and participated in the conspiracy as to all
defendants charged in the indictment, the sine qua non for a
conspiracy."  Smith continues, "[t]he defendant challenges the
government to demonstrate that Mr. Kitson Smith knowingly
conspired to violate the narcotics laws of the United States,"
and requests that the Court order the Government to provide a
bill of particulars to include extraordinary detail regarding the

conspiracy alleged in the indictment.[7]

Smith's demand for a bill of particulars does not meet the standard for granting such an order and should be denied.[8]   A

_____

[7]   Smith seeks: the date and location of the commencement of the conspiracy; the identities, phone numbers and addresses of all participants in the conspiracy; all of the overt acts Smith allegedly committed in furtherance of the conspiracy, and the time, place, and persons present when the overt acts were alleged committed; names and addresses of persons "by whom the government intends to prove that [t]he defendant had knowledge that a conspiracy existed"; the date when Smith entered into the conspiracy and the terms of Smith's agreement and the identities of the persons with whom Smith made an agreement; "the manner in which the defendant furthered the object and purpose of the alleged conspiracy"; and, "the date, time, place and manner of the earliest act of the defendant, or event in which he allegedly participated, upon which the government intends to rely to prove the defendant's participation in, or knowledge of, the alleged conspiracy and it[s] substantive events."  (Smith Br., Part III.)

[8]   The Government notes that Smith's motions to compel additional discovery and a bill of particulars are not properly before the Court because defense counsel has failed to comply with the requirements of Local Criminal Rule 16.1 (stating "No motion addressed to a bill of particulars or answers or to discovery and inspection shall be heard unless counsel for the moving party files with the court simultaneously with the filing of the moving papers an affidavit certifying that said counsel has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issues raised by the motion without the intervention of the court and has been unable to reach such an agreement.  If some of the issues raised by the motion have been resolved by agreement, the affidavit shall specify the issues remaining unresolved.").  Defense counsel has failed to: (1) confer with the Government in an effort in good faith to resolve by agreement the issues raised by the motion; and (2) submit the required affidavit certifying that said counsel has conferred with the Government in an effort in good faith to resolve by agreement the issues raised by the motion without the intervention of the court and has been unable to reach such an agreement.  (See Local Criminal Rule 16.1.)  As a result, defendant's motions for a bill of particulars and additional discovery should be denied.  United States v. Jailall, No. 00 Cr. 069 (RWS), 2000 WL 1368055, at *4 (S.D.N.Y. Sept. 20, 2000) (failure to comply with Local Criminal Rule 16.1 "alone

bill of particulars is required only where the indictment is so general that it does not advise the defendant of the specific acts of which he is accused. United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990) (citations omitted); United States v. Gibson, 2001 WL 460935, at *3 (S.D.N.Y. May 1, 2001) ("[A] bill of particulars is not a matter of right."). A motion for a bill of particulars should be granted only where necessary (1) to inform the accused of the charge against him with sufficient precision to enable him to prepare his defense and avoid surprise; and (2) to enable the accused to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. See Wong Tai v. United States, 273 U.S. 77, 82 (1927); United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). In addition, if the information sought by a defendant is provided in the indictment or through some other means, a bill of particulars is not necessary. See Bortnovsky, 820 F.2d at 574.

"It is not enough that the information would be useful to the defendant; if the defendant has been given adequate notice

would warrant denial of the motion"); United States v. Guevara, No. 99 Cr. 445 (AGS), 1999 WL 639720, at *2 (S.D.N.Y. Aug. 23, 1999) ("[D]efendant has apparently failed to comply with Local Criminal Rule 16.1, which requires that the parties attempt to resolve discovery matters before raising them with the Court. That alone would merit denial of the discovery motions."); United States v. Ahmad, 992 F. Supp. 682, 684-85 (S.D.N.Y. 1998) (Kaplan, J.) ("There is no suggestion that counsel has made any effort to resolve any discovery issues with the government before invoking the aid of the Court. Accordingly, this aspect of the motion also is denied for failure to comply with Rule 16.1.").

of the charges against him, the government is not required to
disclose additional details about its case." United States v.
Payden, 613 F. Supp. 800, 816 (S.D.N.Y. 1985). Further,
supplying evidentiary detail is not the function of the bill of
particulars. See Torres, 901 F.2d at 234. "[A] bill of
particulars is not a general investigative tool, a discovery
device, or a means to compel the government to disclose evidence
or witnesses to be offered prior to trial." Gibson, 2001 WL
460935, at *6; United States v. Strawberry, 892 F. Supp. 519, 526
(S.D.N.Y. 1995). It is not the function of a bill of particulars
to allow defendants to preview the evidence or theory of the
Government's case. United States v. Taylor, 707 F. Supp. 696,
699 (S.D.N.Y. 1989) (citations omitted); United States v.
Persico, 621 F. Supp. 842, 868 (S.D.N.Y. 1985).

Particularly relevant here, the Government is not
required to provide detailed information about the conspiracy,
such as overt acts, how and when the conspiracy was formed, or
when each participant entered it. United States v. Feola, 651 F.
Supp. 1068, 1132 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir.
1989); see also United States v. Tymes, 1999 WL 34971, at *2
(N.D.N.Y. 1999).

Here, a bill of particulars is not necessary because
the information sought by Smith has been more than adequately
provided in the Indictment and discovery. Smith has been

29

provided with substantial discovery, accompanied by letters from
the Government itemizing that discovery.  Specifically, Smith has
received copies of, among other things: the Complaint, which
describes certain of Smith's alleged conduct in furtherance of
the conspiracy; an ABF Freight invoice allegedly signed by Smith;
a report containing a description of Smith's post-arrest
statement; and documents, photos and video concerning the
shipment of the First Crate that Smith allegedly received in Mt.
Vernon.[9]  These materials provide details about the alleged
shipments of marijuana from Arizona, the receipt of the First
Crate in New York, and acts allegedly undertaken by Smith and co-
conspirators to transport the shipments.

Despite the detailed allegations and the discovery
provided by the Government, Smith seeks further information.  His
request for a bill of particulars is an attempt to obtain
additional, detailed discovery about the charged conspiracy and
conspirators, and he is not entitled to it.  See Torres, 901 F.3d
at 233-34; United States v. Bin Laden, 92 F. Supp. 2d 225, 242
(S.D.N.Y. 2000) ("[R]equests, such as those made by the

---

[9]     The Indictment details two overt acts committed by the
defendants in furtherance of the narcotics conspiracy.
"[B]ecause the government is not required to charge any overt
acts in the indictment, the information provided on the face of
count one is, itself, more than [the defendant] has a right to
demand."  Payden, 613 F. Supp. at 817 (denying bill of
particulars in a narcotics conspiracy case where the indictment
set forth overt acts allegedly committed in furtherance of the
conspiracy).

Defendants here, for particulars as to when, where, how, and with whom each individual defendant joined an alleged conspiracy have 'almost uniformly been denied.'" (quoting United States v. Wilson, 565 F. Supp. at 1438)); United States v. Feola, 651 F. Supp. 1068, 1132-33 (S.D.N.Y. 1987) ("Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial."). Taken together, the materials already provided give Smith ample opportunity to prepare his defense and leave no possibility of unfair surprise. Accordingly, Smith's attempt to obtain unauthorized discovery through a bill of particulars should be denied.

D. Rule 404(b) Material

Smith requests an order directing the Government to disclose evidence that it will seek to admit at trial pursuant to Rule 404(b) of the Federal Rules of Evidence 30 days in advance of trial. This request should be denied.

Rule 404(b) provides no strict time deadline for notification. The rule merely requires that the Government provide "reasonable notice in advance of trial, or during trial, if the court excuses pretrial notice on good cause shown" of its intent to use evidence of other crimes, wrongs, and bad acts. Fed. R. Evid. 404(b) (emphasis added). Ten days' notice has routinely been held to be adequate under the notice provision of Rule 404(b). See United States v. Valenti, 60 F.3d 941 (2d Cir.

31

1995) (in embezzlement case, four days' notice of evidence of
prior wire transfers showing defendant's knowledge sufficient
notice of other acts evidence under Rule 404(b)); United States
v. Triana-Mateus, 2002 WL 562649, at *6 (directing Government to
provide 404(b) notice two weeks before trial). Requiring more
lengthy advance notice is not practical, however, because the
evidence that the Government wishes to offer may well change as
the proof and possible defenses crystallize. See United States
v. Matos-Peralta, 691 F. Supp. 780, 791 (S.D.N.Y. 1988). In this
regard, the Second Circuit has approved disclosure of Rule 404(b)
evidence as late as four days before, and even during, trial
depending on the circumstances of the particular case. See
United States v. Valenti, 60 F.3d 941, 945 (2d Cir. 1995) (notice
four days prior to trial sufficient where Government provided
documents to defense on same day they were obtained).

            In this case, no trial date has been scheduled, and the
Government is still determining what specific evidence it will
seek to introduce. Accordingly, the Government respectfully
submits that it will provide additional 404(b) notice at least
ten business days (two weeks) before trial. Such timely
disclosure will enable the defense an opportunity to challenge
the admission of any such evidence and the Court to make
appropriate findings.

E.  Prior Convictions, Bad Acts, Uncharged Crimes Offered
    for Impeachment Purposes

Smith "intends to testify on his own behalf in this
matter" and claims that he "should not be weighed down with
excess baggage of prior bad acts, convictions, or uncharged
crimes." (Smith Br., Part VI.)  Smith's motion should be denied
as premature.

Rule 609(a)(1) of the Federal Rules of Evidence
provides that "evidence that an accused has been convicted of [a
felony] shall be admitted if the court determines that the
probative value of admitting this evidence outweighs its
prejudicial effect to the accused." Fed. R. Evid. 609(a)(1).
Evidence of convictions for crimes involving "dishonesty or false
statement" is admissible regardless of its effect and regardless
of whether the crimes are misdemeanors or felonies. Id.
609(a)(2); see United States v. Hourihan, 66 F.3d 458, 464 (2d
Cir. 1995). Evidence of prior convictions is subject to a time
limit of ten years from the later of the date of conviction or
the date the defendant was released from confinement relating to
the conviction. See id. 609(b). Even convictions that are more
than ten years old may be used for impeachment purposes, however,
if "the probative value supported by specific facts and
circumstances substantially outweighs its prejudicial effect."
Id.

Motions to preclude impeachment with prior convictions

33

are typically filed as motions in limine.  Smith's motion should therefore be denied as premature.  See United States v. Campbell, No. 04 Cr. 903 (GEL), 2005 WL 1875774, at *3 (S.D.N.Y. July 26, 2005) (denying defendant's motion without prejudice as "premature, as there is currently no indication that the Government seeks to [cross-examine the defendant with his prior convictions, or introduce 404(b) evidence], and certainly no indication that the Government plans to do so in a way that violates Rules 404(b) and 609"); United States v. Garcia, No. 94 Cr. 1003 (LMM), 1996 WL 51197, at *3 (S.D.N.Y. Feb. 8, 1996).

      F.    Brady Material

      Smith requests that the Government disclose "Brady material" in time for the effective use of the material at trial, and during the course of this request makes reference to "material impeachment evidence."  (Smith Br., Part VII.)  Pursuant to the Due Process Clause of the United States Constitution, the Government has a duty to disclose favorable evidence to the accused where such evidence is "material" either to guilt or to punishment.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  Favorable evidence includes evidence that tends to exculpate the accused, see id., as well as evidence that is useful to impeach the credibility of a government witness.  See Giglio v. United States, 405 U.S. 150, 154 (1972).  As the Court of Appeals has explained, Brady and Giglio material must be

34

provided by the Government "in time for its effective use at trial." In re United States (United States v. Coppa), 267 F.3d 132, 146 (2d Cir. 2001); see also id. ("the prosecutor must disclose . . . exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made").

"Courts in this Circuit have repeatedly denied pre-trial requests for discovery orders pursuant to Brady where the Government, as here, has made a good-faith representation to the Court and defense counsel that it recognizes and has complied with its disclosure obligations under Brady." United States v. Birkett, 1999 WL 689992, at *6 (S.D.N.Y. Sept. 2, 1999) (collecting cases); accord United States v. Cook, 348 F. Supp. 2d 22 (S.D.N.Y. 2004); United States v. Trochelmann, 1999 WL 294992, at *3 (S.D.N.Y. May 11, 1999). In its April 1, 2009 discovery letter, the Government advised Smith that it recognizes its obligations under Brady, and its progeny, and that the Government is, to date, unaware of any Brady material. In addition, the Government advised Smith that in the event such material comes to light, it will provide timely disclosure. Accordingly, Smith's motion is unnecessary in light of the Government's good-faith representations regarding the disclosure of Brady material and should be denied.

With respect to the timing of disclosing material under
Giglio, the Second Circuit, in In re U.S., 267 F.3d 32 (2d Cir.
2001), rejected the argument that such material should be
disclosed when defendants make a demand for it.  The Court held
that as a general rule, Brady and its progeny do not require
immediate disclosure of all exculpatory and impeachment material
upon request of a defendant.  Id. at 146.  The Court found that
"we have never interpreted due process of law as requiring more
than that Brady material must be disclosed in time for its
effective use at trial."  Id. at 142.

The Court reiterated that material required to be
disclosed by Brady and Giglio is material, which, if not
disclosed, creates a reasonable probability of altering the
outcome.  Id. at 146.  It found that the time required for its
effective use would depend on the materiality of the evidence as
well as the particular circumstances of the case.  Id. at 146.
The Court also suggested that district courts may order
disclosure of material it deems material as a matter of case
management.  Id. at 146.

Here, the Government will provide Smith with all
impeachment materials that must be produced under Giglio, as well
as Jencks Act materials that must be produced under 18 U.S.C. §
3500 on the Friday prior to the start of the trial, or on such
date as ordered by the Court once the trial has been scheduled.

Under the circumstances of this case, there is no need for early disclosure of impeachment material under Giglio. The Government does not intend at this time to call any witnesses who require the disclosure of voluminous impeachment materials. The provision of the impeachment material on the Friday before the first day of trial will allow defense counsel adequate time to prepare for cross-examination of Government witnesses as they come up at trial. See, e.g., United States v. Wilson, 01 Cr. 53, 2001 WL 727026, at *1-2 (S.D.N.Y. 2001) (Government intends to provide Section 3500 material to defense counsel the Thursday before a witness testifies unless the volume of the material indicates that earlier disclosure is warranted); United States v. Trippe, 171 F. Supp. 2d 230, 237 (S.D.N.Y. 2001) ("The usual practice in this district is that the Government agrees to make impeachment information available to the defense at the same time as Jencks Act material, that is, at least one day before the Government witness is called to testify"; but in that case, Government offered to produce impeachment material the Friday before a witness was scheduled to testify); United States v. Rueb, 00 Cr. 91, 2001 WL 96177, at *6-7 (S.D.N.Y. Feb. 5, 2001) (Government directed to provide Giglio material at least one day before calling the relevant witness to testify).

> G.    Permission To Join in Taylor's Pre-Trial Motion
>
>         Smith's counsel stated at the May 7, 2009 pre-trial

37

conference that Smith lacked standing to move to suppress the marijuana found in the crates, but Smith now moves for permission "to join in the motion of his co-defendant to the extent that they be [sic] applicable to him." (Smith Br., Part XI.) Smith's motion should be denied. Without asserting facts that show he had a subjective expectation of privacy in the crates containing the marijuana, Smith fails to meet his burden of establishing standing to challenge the search of the crates.

"[A] defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure." United States v. Padilla, 508 U.S. 77, 81 (1993) (emphasis in original); see also United States v. Payner, 447 U.S. 727 (1980). This is because the Fourth Amendment protects people, and not simply places. See Katz v. United States, 389 U.S. 347, 353 (1967).

As such, an individual challenging the constitutionality of a search bears the burden of demonstrating a legitimate expectation of privacy in the particular premises searched in order to proceed in challenging the admissibility of evidence recovered in a search. See Minnesota v. Carter, 525 U.S. 83, 87-88 (1998); Rawlings v. Kentucky, 448 U.S. 98, 104 (1980); Rakas v. Illinois, 439 U.S. 128, 133-39 (1978); United States v. Watson, 404 F.3d 163, 166 (2d Cir. 2005). To meet this

burden, a defendant asserting a legitimate expectation of privacy in the object of a search or seizure must establish two elements: (1) a subjective expectation of privacy in the object, and (2) a willingness on the part of society to recognize that expectation as legitimate.  See, e.g., California v. Ciraolo, 476 U.S. 207, 211 (1986); Florida v. Riley, 488 U.S. 445, 449-50 (1989); Kyllo v. United States, 533 U.S. 27, 28 (2001); United States v. Cody, 434 F. Supp. 2d 157, 167 (S.D.N.Y. 2006).

Smith has not demonstrated with a sworn statement or otherwise that he had a legitimate expectation of privacy in the crates from which the marijuana was seized.  Smith therefore lacks standing to challenge the search of the crates, and his motion for permission to join Taylor's motion to suppress should be denied.

IV.  The Government Seeks to Offer at the Evidentiary Hearing Statements Made by Smith During Proffer Sessions

In support of his motion to suppress his post-arrest statements, Smith submitted to the Court a sworn declaration in which he states, among other things, "[a]t the time of my apprehension, I was not committing any crime nor had I committed any crime.  I was holding a black case which contained a cordless drill and I also had several cellular phones.  These items were confiscated from me by the agents without my consent."  (Smith Declaration, ¶ 4.)  During a proffer session with the Government, however, Smith made statements inconsistent with these sworn

39

assertions.  The Government therefore seeks to offer at the
evidentiary hearing Smith's proffer statements to rebut Smith's
declaration and any other evidence or arguments offered on
Smith's behalf that are inconsistent with the proffer statements,
and/or to impeach Smith in the event he testifies.

        Smith met with the Government in two proffer sessions,
on or about November 10, 2008 and March 13, 2009, respectively.
The proffer sessions were governed by a proffer agreement (the
"Proffer Agreement"), which Smith signed at each session.[10]  The
Proffer Agreement, in which Smith is referred to as "Client,"
provides, in pertinent part, the following:

> (2) In any prosecution brought against Client by [the
> United States Attorney's Office for the Southern
> District of New York], except as provided below the
> Government will not offer in evidence on its case-in-
> chief, or in connection with any sentencing proceeding
> for the purpose of determining an appropriate sentence,
> any statements made by Client at the meeting, except in
> a prosecution for false statements, obstruction of
> justice or perjury with respect to any acts committed
> or statements made during or after the meeting or
> testimony given after the meeting.
>
> (3) Notwithstanding item (2) above: (a) the Government
> may use information derived directly or indirectly from
> the meeting for the purpose of obtaining leads to other
> evidence, which evidence may be used in any prosecution
> of Client by the Government; (b) in any prosecution
> brought against Client, the Government may use

---

[10]    At the first proffer session, Smith and his attorney at
the time signed the Proffer Agreement, as did Detective Courtney
Besley of the Drug Enforcement Administration Westchester Task
Force, and the undersigned for the Government.  At the second
proffer session, Smith, his current attorney Larry Sheehan, Esq.,
Detective Besley, and the undersigned initialed the Proffer
Agreement.

statements made by Client at the meeting and all
evidence obtained directly or indirectly therefrom for
the purpose of cross-examination should Client testify;
and (c) the Government may also use statements made by
Client at the meeting to rebut any evidence or
arguments offered by or on behalf of Client (including
arguments made or issues raised sua sponte by the
District Court) at any stage of the criminal
prosecution (including bail, all phases of trial, and
sentencing) in any prosecution brought against Client.

(Proffer Agreement, at 1.)

During the first proffer session with the Government,
Smith stated, in part and in substance, that an individual Smith
knew only as "Smoke" had asked Smith to receive packages at the
Warehouse.  Smoke then had several packages sent to the Warehouse
in 2008.  Prior to the First Crate's arriving at the Warehouse in
November, Smoke contacted Smith and told him that a package was
coming, and Smith received the package – the First Crate – when
it arrived.  Additionally, Smith stated, in part and substance,
that he was handed the power drill that day by his cousin, Morris
Campbell, but that neither the drill nor Campbell had anything to
do with the package.

During the second proffer session, Smith stated, in
part and in substance, that he had lied during the first proffer
session about Campbell.  Campbell had orchestrated the entire
marijuana shipment.  Smith met with Campbell and an individual he
believes was Taylor twice in the weeks before his arrest, and
discussed receiving a shipment of marijuana at the Warehouse, for
which Smith would be paid $1,000.  Before the First Crate

41

arrived, Campbell called Smith and said that the package was coming, and when the First Crate arrived, Smith called Campbell and told him of its arrival.

Proffer agreements such as that executed by the parties here have been upheld and routinely enforced by and within the Second Circuit. See United States v. Velez, 354 F.3d 190 (2d Cir. 2004); United States v. Parra, 302 F. Supp. 2d 226, 235-40 (S.D.N.Y. 2004); United States v. Chan, 185 F. Supp. 2d 305, 308 (S.D.N.Y. 2002); United States v. Chaparro, 181 F. Supp. 2d 323, 334 (S.D.N.Y. 2002). As Judge Cote explained in Chaparro, there is "no unfairness to [defendant] in allowing use of his statements during proffer sessions once he has opened the door to their use by his arguments and evidence," because the "design of the [Proffer] Agreement provides any defendant who decides to speak with the Government strong incentives to speak truthfully, and discourages anyone from speaking at all if she intends to lie or intends at a later time in the prosecution to advocate a position at odds with the facts she describes during the proffer session." 181 F. Supp. 2d at 334.

Here, Smith has opened the door to admission of his proffer statements at the evidentiary hearing by submitting a sworn statement in support of his motion that is inconsistent with his proffer statements. There is no unfairness to Smith in the admission of his statements, as the Proffer Agreement's terms

discouraged Smith from speaking at all if he intended to lie during the proffer sessions or to make a statement later to the Court inconsistent with the statements he made to the Government. Moreover, while the sworn statement that Smith made that is inconsistent with his proffer statements – regarding the circumstances of his arrest and whether he had committed any crime – is not necessarily material to his motion to suppress his post-arrest statements – regarding whether Smith was advised of his rights following his arrest – the truthfulness of Smith's sworn statement goes directly to Smith's credibility, which is pivotal to Smith's motion.   The Government therefore seeks to offer Smith's proffer statements at the evidentiary hearing in this case.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny defendant Taylor's pretrial motion. The Government consents to an evidentiary hearing on defendant Smith's motion to suppress evidence, and requests that the Court deny Smith's remaining pretrial motions.

Dated:      White Plains, New York
            July 17, 2009

                    Respectfully submitted,

                    LEV L. DASSIN
                    Acting United States Attorney for the
                    Southern District of New York

                    By: _____
                    Benjamin Allee
                    Assistant United States Attorney
                    (914) 993-1962

44

# EXHIBIT   A

COPY

Approved: BENJAMIN ALLEE
ASSISTANT UNITED STATES ATTORNEY

U.S ATTORNEY
FOR THE S.D.N.Y.

Before:  HONORABLE GEORGE A. YANTHIS
United States Magistrate Judge
Southern District of New York

NOV 7 - 2008

RECEIVED
WHITE PLAINS OFFICE

X - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
United States of America

8 M 2402

                              :    COMPLAINT

      v.

                              :

KITSON J. SMITH,                   Violation of:  21 U.S.C.
SHAWN D. TAYLOR, and        :   § 846
LUIS GARCIA,

                              :

        Defendants.           County of Offense:
                              Westchester

                              :
X - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

       COURTNEY BESLEY, being duly sworn, deposes and says
that he is a Detective with the City of Mount Vernon Police
Department and assigned to the Westchester Drug Enforcement
Agency ("DEA") Task Force and charges as follows:

### COUNT ONE

       From on or about October 27, 2008 through and including
on or about November 3, 2008, in the Southern District of New
York and elsewhere, KITSON J. SMITH, SHAWN D. TAYLOR, and LUIS
GARCIA, the defendants, and others known and unknown, unlawfully,
intentionally and knowingly did combine, conspire, confederate
and agree together and with each other to violate the narcotics
laws of the United States.

       It was a part and an object of the conspiracy that
KITSON J. SMITH, SHAWN D. TAYLOR, and LUIS GARCIA, the
defendants, and others known and unknown, unlawfully,
intentionally, and knowingly would distribute and possess with
intent to distribute a controlled substance, to wit, 100
kilograms and more of mixtures and substances containing a
detectable amount of marijuana, in violation of Title 21, United
States Code, Sections 812, 841(a), and 841(b)(1)(B).

1

(Title 21, United States Code, Section 846.)

The bases for deponent's knowledge and for the foregoing charges are, in part, as follows:

1.    I am a Detective assigned to the Westchester DEA Task Force.  I have been personally involved in the investigation of this matter.  This affidavit is based upon my investigation, my conversations with other law enforcement agents, and my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

2.    On or about October 27, 2008, I was contacted by a DEA Special Agent with the Tucson, Arizona DEA office ("Special Agent 1").  Special Agent 1 informed me that a crate containing approximately 95 kilograms of marijuana was seized at ABF Freight, a shipping company, in Tucson, Arizona.  The label on the crate indicated it was bound for Barry House Coffee, in Mount Vernon, New York (the "Warehouse").

3.    Special Agent 1 further informed me that the Arizona DEA office returned the crate to the shipping company for purposes of a controlled delivery.  The marijuana was removed from the crate and objects of roughly equivalent weight were placed in the crate.

4.    According to shipping tracking records, the crate was shipped from Arizona on or about October 27, 2008, and between on or about November 1 and November 2, 2008, the crate arrived at an ABF Freight warehouse in Stratford, Connecticut.  On or about November 3, 2008, early in the morning, other Task Force agents observed the crate at the warehouse in Stratford, Connecticut.  The crate was loaded onto another delivery truck.  The agents surveilled the delivery truck leave the ABF Freight warehouse, and followed it to Mount Vernon, New York.

5.    On or about November 3, 2008, at approximately 8:00 a.m., other agents on the DEA Task Force set up surveillance at the Warehouse.  The agents observed a black male, later identified as KITSON J. SMITH, the defendant, arrive at the Warehouse.  After SMITH went inside, I arrived at the scene and surveilled the Warehouse.  At approximately 10:00 a.m., other agents and I observed SMITH and a white Hispanic male, later

2

identified as LUIS GARCIA, the defendant, exit the Warehouse.

6.    Shortly thereafter, on or about November 3, 2008, at approximately 10:15 a.m., the delivery truck with the crate arrived at the Warehouse, and the driver backed the truck up to a loading dock, and opened the cargo area.  KITSON J. SMITH looked at the crate in the truck, entered the Warehouse, and returned driving a forklift.  SMITH picked up the crate on the forklift and drove it inside the Warehouse.

7.    Approximately 15 to 20 minutes later, other agents and I observed a black Lexus SUV (the "Lexus") with two males inside arrive at the Warehouse.  SMITH exited the Warehouse and went to the driver's side door of the Lexus.  Through the driver's side window SMITH was handed a bag with a box inside it, and the Lexus then left the vicinity of the Warehouse.  Other agents followed the Lexus after it left.

8.    I observed KITSON J. SMITH walk to his car and remove a hammer from the trunk.  SMITH walked to a garbage can outside and threw away the bag and box he had been handed from the Lexus, leaving him holding a black case.  Other agents and I then arrested SMITH.  The black case was found to contain a power drill.  Shortly thereafter, other agents and I entered the Warehouse and arrested LUIS GARCIA.  Inside the Warehouse was the crate, which was unopened.  At about the same time, the agents following the Lexus pulled it over and arrested the two males.  The passenger was SHAWN D. TAYLOR, the defendant.

9.    Based on my discussions with a manager of Barry House Coffee, I know that LUIS GARCIA works at the Warehouse, and that KITSON J. SMITH used to work at the Warehouse, but no longer does, and is not authorized to be there.

10.    Following his arrest, GARCIA stated to a Task Force officer that on three prior occasions he was present when KITSON J. SMITH, the defendant, along with another male who drove a black Lexus SUV, received shipments at the Warehouse.  On these occasions SMITH told GARCIA that the packages contained marijuana, and SMITH paid GARCIA $300 each time.  GARCIA also stated that he did not recognize SHAWN D. TAYLOR, the defendant, as the male who had been at the Warehouse for these previous shipments.

11.    Following his arrest, agents seized from SHAWN D. TAYLOR, the defendant, a cell phone.  Agents observed on the cell phone a text message received from an Arizona area code, dated on or about November 3, 2008, at approximately 8:28 a.m., that read:

"It say it de CT.  Wait for delivery."  Agents also seized a
napkin from TAYLOR's pocket.  Written on the napkin were what
appeared to be marijuana records.

     12.   Special Agent 1 has informed me that another crate
containing approximately 125 kilograms of marijuana was seized in
Tucson, Arizona, on or about October 29, 2008.  The crate was
shipped by the same individual who had shipped the crate on
October 27, 2008, and the shipping destination again was the
Warehouse.


     WHEREFORE, deponent prays that a warrant be issued for
the arrest of the above named individuals and that they be
arrested and imprisoned or bailed as the case may be.


Courtney Besley
Mount Vernon Police Department
Detective and Task Force Officer
Westchester DEA Task Force


Sworn to before me this
3rd day of November, 2008

4

# EXHIBIT   B

Case Number  MQ-09-0010
Warrant Number _____

# Telephonic Search Warrant Worksheet

Officer:  Judge <u>Michael Miller</u>, this is Officer Ferdinand Tolentino of the Oro Valley Police Department. Will you swear me in please?

Judge:  (The Judge swears you in)

Officer:  This is Officer Ferdinand Tolentino, badge #52 of the Oro Valley Police Department. I am calling you on the __27__ day of __October__, 2008, with (witness officer) <u>S/A Rick Bermudez of DEA</u> standing by as a witness. The time now is __1900__ hours.
I am calling for a telephonic search warrant and have just and probable cause to believe that there is now/will be:

(X) In the possession of:
ABF Freight Systems Inc
_____

(X) On the premises located at:
2943 E. Wieding Rd Tucson AZ
_____

(X) The property described as:
A wooden crate measuring approx. 67" X 27" X 27" containing three 20" cubed corrugated boxes addressed to Barry House Coffee at 110 Hartford Ave. Mt Vernon NY.

The following property to wit:

(X) 1. Marijuana, Narcotic Drugs and/or Dangerous Drugs

(X) 2. Drug related monies

(X) 3. Paraphernalia for packaging, cutting, weighing and distributing marijuana, narcotic drugs, and/or dangerous drugs

(X) 4. Any other fruits, instrumentalities and evidence of the crimes of possession, transportation, transfer and/or sale of marijuana, narcotic drugs and/or dangerous drugs as set forth in the affidavit.

( ) 5. Indicia of occupancy, residency, and local ownership of the premises

( ) 6. Books, records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's check receipts, passbooks, bank checks and other items evidencing the obtaining, secreting, transfer, concealment and/or expenditure of money, including computerized records.

( ) 7. Weapons commonly used to protect illegal proceeds

( ) 8. Cellular telephones, pagers, and portable radios commonly used in the sales of marijuana, narcotic drugs and/or dangerous drugs.

As set forth in this affidavit

That I, Officer Tolentino, your affiant, am a police officer in the State of Arizona employed by the Oro Valley Police Department and assigned to the DEA Transportation Group 4. I have been a police officer for over 19 years and have the following specialized training and experience. I graduated from Tucson Police Training Academy in March of 1989. My training included the identification of marijuana, narcotic drugs and dangerous drugs.

Since that time, I have received additional training in schools and seminars regarding the identification, transportation, distribution, manufacturing and interdiction of marijuana, narcotic drugs and dangerous drugs. I have worked as a patrol officer, a DUI investigator, a Gang investigator with the Arizona State Gang Task Force, also know as GITEM, and as a narcotics investigator with the Metropolitan Area Narcotics Trafficking Interdiction Squad currently known as the Counter Narcotics Alliance. I have worked undercover to purchase narcotic drugs and dangerous drugs. I have participated in over 100 incidents that involve the shipment and transportation of marijuana, narcotic drugs, and dangerous drugs and proceeds from their transactions through the US Mail, and other private shipping companies.

I am presently assigned to as a Task Force Officer with in the Drug Enforcement Administration Tucson District Office. This unit is involved in investigating individuals and organizations involved in narcotics and dangerous drug trafficking in Southern Arizona.

I am investigating the crime(s) of:
_X_ Unlawful possession of marijuana
_X_ Unlawful possession of a narcotic drug/dangerous drug
_X_ Conspiracy to _Transfer marijuana, narcotic drug or dangerous drug_
_X_ Unlawful transfer/offer to sell a marijuana, narcotic drug, or dangerous drug

Which I believe to have been committed/will be committed on the _27_ day of ___OCTOBER___, 2008, in Pima County, Arizona, based on the following reasons:

## AFFIDAVIT

Today, October 27, 2008, your affiant received information from a source of information that there was a suspicious package at the UPS Store located at 6336 N Oracle Rd. Tucson AZ. Information was provided by a second source that a subject had requested the UPS Store to build a wooden crate to hold three (3) 20" cubed boxes for shipment.

Earlier today, this source stated that the subject brought three boxes that were placed into the wooded crate and initially stated that the contents were books then changed it to computer equipment. The total weight of the crate and its contents was estimated at 215 pounds. The shipper paid the $2,860.00 shipping cost in cash made up of twenty dollar bills. The crate was addressed to "Barrie House Coffee" at 110 Hartford Ave. Mt Vernon NY. Investigations showed a "Barrie House Coffee" at 216 S 13th Ave Mt Vernon NY. The address of 110 Hartford Ave could not be located. The shipper gave the UPS Store a name of Junior Jones and an address of 6363 N Montebella Rd

Case Number  MQ-09-0010
Warrant Number _____

Tucson AZ. This address is an apartment complex and the shipper did not leave an apartment number. The phone number provided for Jones is (602) 410-6740. This number is from Phoenix. The shipper was not contacted pending possible control delivery by New York law enforcement.

At approx 6:30 PM, Officer Roger Reynolds, a K-9 handler for the Oro Valley Police Department, responded to ABF Freight to assist with the investigation. Officer Reynolds had his K-9 Nikko check the crate along with other items on the ABF loading dock. At 1841 hrs Officer Reynolds stated that his K-9 Nikko alerted on the crate to NY and no other packages on the dock.

That based on the preceding facts, I, Officer Ferdinand Tolentino request that a telephonic search warrant be issued. I also request that you consider this affidavit and incorporate it into the warrant itself. This concludes my affidavit your honor.

Judge: I do find that there probable cause to issue the search warrant. You may sign my name Michael Miller M-I-L-L-E-R. I assume you are going to execute before 10:00.

Officer: Yes your honor, I will be executing the, opening the crate after directly after we get off the phone. I am currently at ABF.

Judge: Ok, you can read back to me the telephonic search warrant leaving out the spaces that are blank.

Officer: I will your honor.

**********READ THE SEARCH WARRANT**********

Officer: The time now is _1909_ hours. I will sign this and have my witness sign with your name on top.

Judge: You want to check that your recording worked.

Officer: Yes your honor.

## WARRANT SERVICE

Warrant Served:    Date: _October 27, 2008_  Time: _1910_ P.M.

SW Transcript 10-27-08.doc          Page 3 of 3

57

# EXHIBIT   C

Case Number  MQ-08-0010
Warrant Number _____

## Telephonic Search Warrant Worksheet

Officer:    Judge ___MILLER___, this is Officer Ferdinand Tolentino of the Oro Valley
            Police Department. Will you swear me in please?

Judge:      Do you swear to tell the truth the whole truth and nothing but the truth so help
            you God.

Officer:    I do.

Judge:      Go ahead.

Officer:    This is Officer Ferdinand Tolentino, badge #52 of the Oro Valley Police
            Department. I am calling you on the __29__ day of __October__, 2008, with
            _Special Agent Rick Bermudez of DEA_ standing by as a witness. The time
            now is ___1810___ hours.
            I am calling for a telephonic search warrant and have just and probable cause
            to believe that there is now/will be:

(X) In the possession of:
  _Roadway Express_

(X) On the premises located at:
  _601 W Flores St. Tucson AZ_

(X) The property described as:
  _A wooden crate measuring 77" X 28" X 28" addressed to Barry House Coffee at 110
Hartford Ave. Mt Vernon NY._

The following property to wit:

(X) 1. Marijuana, Narcotic Drugs and/or Dangerous Drugs

(X) 2. Drug related monies

(X) 3. Paraphernalia for packaging, cutting, weighing and distributing marijuana,
       narcotic drugs, and/or dangerous drugs

(X) 4. Any other fruits, instrumentalities and evidence of the crimes of possession,
       transportation, transfer and/or sale of marijuana, narcotic drugs and/or
       dangerous drugs as set forth in the affidavit.

( ) 5. Indicia of occupancy, residency, and local ownership of the premises

( ) 6. Books, records, receipts, bank statements and records, money drafts, letters of
       credit, money orders and cashier's check receipts, passbooks, bank checks and
       other items evidencing the obtaining, secreting, transfer, concealment and/or
       expenditure of money, including computerized records.

( ) 7. Weapons commonly used to protect illegal proceeds

( ) 8. Cellular telephones, pagers, and portable radios commonly used in the sales of
       marijuana, narcotic drugs and/or dangerous drugs.

SW Transcript 10-29-08.doc                Page 1 of 3

DEA HIDTA

Case Number  MO-09-0010
Warrant Number _____

As set forth in this affidavit

That I, Officer Tolentino, your affiant, am a police officer in the State of Arizona employed by the Oro Valley Police Department and assigned to the DEA Transportation Group 4. I have been a police officer for over 19 years and have the following specialized training and experience. I graduated from Tucson Police Training Academy in March of 1989. My training included the identification of marijuana, narcotic drugs and dangerous drugs.

Since that time, I have received additional training in schools and seminars regarding the identification, transportation, distribution, manufacturing and interdiction of marijuana, narcotic drugs and dangerous drugs. I have worked as a patrol officer, a DUI investigator, a Gang investigator with the Arizona State Gang Task Force, also know as GITEM, and as a narcotics investigator with the Metropolitan Area Narcotics Trafficking Interdiction Squad currently known as the Counter Narcotics Alliance. I have worked undercover to purchase narcotic drugs and dangerous drugs. I have participated in over 100 incidents that involve the shipment and transportation of marijuana, narcotic drugs, and dangerous drugs and proceeds from their transactions through the US Mail, and other private shipping companies.

I am presently assigned to as a Task Force Officer with in the Drug Enforcement Administration Tucson District Office. This unit is involved in investigating individuals and organizations involved in narcotics and dangerous drug trafficking in Southern Arizona.

I am investigating the crime(s) of:
_X_ Unlawful possession of marijuana
_X_ Unlawful possession of a narcotic drug/dangerous drug
_X_ Conspiracy to _Transfer marijuana, narcotic drug or dangerous drug_
_X_ Unlawful transfer/offer to sell a marijuana, narcotic drug, or dangerous drug

Which I believe to have been committed/will be committed on the _29_ day of
_OCTOBER_, 2008, in Pima County, Arizona, based on the following reasons:

## AFFIDAVIT

On, October 27, 2008, your affiant executed a search warrant on a wooden crate at ABF Freight Services that was shipped from the UPS Store located at 6336 N Oracle Rd. Tucson AZ addressed to 110 Hartford Ave. Mt Vernon NY. This crate was found to contain approximately 200 pounds of marijuana. Yesterday, 10-28-2008, information was provided by a source of information that the same subject had shipped a second crate from the same location to the same address in New York. The subject paid the UPS Store in cash and requested that three 24" boxes be placed into the wooden crate be shipped through Roadway Express.

Today, October 29, 2008, your affiant responded to Roadway express and located the shipment to New York. The crate was addressed to "Barry House Coffee" at 110 Hartford Ave, Mt Vernon NY and was shipped from the UPS Store at 6336 N Oracle Rd.

Case Number  MQ-09-0010
Warrant Number _____

At approx 1730 Hrs. Officer Roger Reynolds, a K-9 handler for the Oro Valley Police Department, responded to Roadway Express to assist with the investigation. Officer Reynolds had his K-9 Nikko check the crate along with other items in the Roadway truck. At 1745 hrs Officer Reynolds stated that his K-9 Nikko alerted on the crate to NY.

Based on the continuing investigation in New York and the pending control delivery of the previous crate, Your affiant respectfully request that if issued, this warrant be sealed until November 11, 2008.

That based on the preceding facts, I, Officer Ferdinand Tolentino request that a telephonic search warrant be issued. I also request that you consider this affidavit and incorporate it into the warrant itself. This concludes my affidavit your honor.

Judge:  The courts find there is probable cause to issue the warrant

Officer:  I will now read verbatim to you the standard Arizona Duplicate Original search Warrant, State of Arizona. Would you like me to indicate which spaces I have I have left blank?

Judge:  No, you can just indicate the one ones you are completing.

Officer:  Thank you.

**\*\*\*\*\*\*\*\*\*\*READ THE SEARCH WARRANT\*\*\*\*\*\*\*\*\*\*\***

Officer:  How would you like me to affix your name on the warrant your honor?

Judge:  You can sign it Michael M-I-C-H-A-E-L Miller M-I-L-L-E-R

Officer:  OK, I'm putting your name. The date now is 10-29-08, the time is 1818 hours I will be signing it and I will have my witness sign it as well you're your honor. Thank you very much your honor.

Judge:  You want to double check the recording.

Officer:  I will.

## WARRANT SERVICE

Warrant Served:  Date: ___10-29-2008___  Time: __1820__ P.M.

SW Transcript 10-29-08.doc          Page 3 of 3

# EXHIBIT   D



# EXHIBIT   E

## PROFFER AGREEMENT

With respect to the meeting of Kitson Smith ("Client") and his attorney, Paul Davison, Esq., with Assistant United States Attorney Benjamin Allee to be held at the Office of the United States Attorney for the Southern District of New York on November 10, 2008 ("the meeting"), the following understandings exist:

(1) **THIS IS NOT A COOPERATION AGREEMENT.** The Client has agreed to provide the Government with information, and to respond to questions, so that the Government may evaluate Client's information and responses in making prosecutive decisions. By receiving Client's proffer, the Government does not agree to make a motion on the Client's behalf or to enter into a cooperation agreement, plea agreement, immunity or non-prosecution agreement. The Government makes no representation about the likelihood that any such agreement will be reached in connection with this proffer.

(2) In any prosecution brought against Client by this Office, except as provided below the Government will not offer in evidence on its case-in-chief, or in connection with any sentencing proceeding for the purpose of determining an appropriate sentence, any statements made by Client at the meeting, except in a prosecution for false statements, obstruction of justice or perjury with respect to any acts committed or statements made during or after the meeting or testimony given after the meeting .

(3) Notwithstanding item (2) above: (a) the Government may use information derived directly or indirectly from the meeting for the purpose of obtaining leads to other evidence, which evidence may be used in any prosecution of Client by the Government; (b) in any prosecution brought against Client, the Government may use statements made by Client at the meeting and all evidence obtained directly or indirectly therefrom for the purpose of cross-examination should Client testify; and (c) the Government may also use statements made by Client at the meeting to rebut any evidence or arguments offered by or on behalf of Client (including arguments made or issues raised sua sponte by the District Court) at any stage of the criminal prosecution (including bail, all phases of trial, and sentencing) in any prosecution brought against Client.

(4) The Client understands and agrees that in the event the Client seeks to qualify for a reduction in sentence under Title 18, United States Code, Section 3553(f) or United States Sentencing Guidelines, Sections 2D1.1(b)(11) or 5C1.2, the Office may offer in evidence, in connection with the sentencing, statements made by the Client at the meeting and all evidence obtained directly or indirectly therefrom.

(5) To the extent that the Government is entitled under this Agreement to offer in evidence any statements made by Client or leads obtained therefrom, Client shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.

1

(6) If this Office receives a request from another prosecutor's office for access to information obtained pursuant to this Proffer Agreement, this Office may furnish such information but will do so only on the condition that the requesting office honor the provisions of this Agreement.

(7) It is further understood that this Agreement is limited to the statements made by Client at the meeting and does not apply to any oral, written or recorded statements made by Client at any other time. No understandings, promises, agreements and/or conditions have been entered into with respect to the meeting other than those set forth in this Agreement and none will be entered into unless in writing and signed by all parties.

(8) The understandings set forth in paragraphs 1 through 7 above extend to the continuation of this meeting on the dates that appear below.

(9) Client and Attorney acknowledge that they have fully discussed and understand every paragraph and clause in this Agreement and the consequences thereof.

Dated: New York, New York

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York

Client

By: _____
Assistant United States Attorney

Attorney for Client

Witness

**Dates of Continuation**

3/13/09

**Initials of counsel, Client, AUSA, witness**

2

Rev. 7/06